**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

———————————————————————— )
Mary Perez, Jazmin Unruh, Claude Reed,        )
Pamela Grace, Daniel Perry, Saibou Sidibe      )
Jacqueline Chretien, Catherine Assanah         )
and Melissa Escudero                           )
          Plaintiffs,                          )     Index No._____
                                   )
                                   )
                                   )
                                   )     **COMPLAINT**
     -Against-                              )
                                   )     **JURY TRIAL DEMANDED**
Miguel Cardona, in his capacity as Secretary   )
of the Department of Education; Janet Yellen,   )
in her capacity as Secretary of the Department  )
of Treasury; Coast Professional, Inc.; and     )
Maximus Federal Services, Inc.,                )
                                   )
          Defendants.                         )
———————————————————————— )

**PRELIMINARY STATEMENT**

1.      Plaintiffs are student loan borrowers challenging Defendants' unlawful practices of intercepting their tax refunds and/or offsetting their Social Security benefits without due process under the United States Department of the Treasury's offset program.

2.      Specifically, Defendants fail to advise borrowers that they can cure their defaulted student loans and keep their tax refunds and/or Social Security benefits by consolidating their loans.  Consolidation requires no payment and qualifies borrowers for Income-Driven Repayment plans that ensure the borrower can pay rent, buy food, and remain current on their loans.

1

3.      Because of Defendants' actions, many of the Plaintiffs (and their children, as applicable) went without food, clothing and other necessities.  Many worried about rent, feared homelessness, and fell into further debt on other obligations.  One Plaintiff, who was 67 years old at the time, slept in a hospital emergency room because he could no longer afford a room at a hostel.  Another, a mother of two, relied on a food bank for the first time.  A third relied on the charity of neighbors. The offsets, that were completely avoidable if Defendants had simply told Plaintiff's about Consolidation, caused depression, shame and feelings of despair.

4.      The plight of these Plaintiffs is shared by over one million struggling borrowers whose defaulted loans are held by the U.S. Department of Education and who find that their tax refunds and Social Security payments have been intercepted to collect payment on their loans without their having received a meaningful opportunity to avoid the interception of their tax refunds and Social Security payments by consolidating their loans.

## JURISDICTION

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 2201, and claims pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692.

6.      This Court has jurisdiction over the Administrative Procedure Act ("APA") claims under 5 U.S.C. § 706 against the Department of Education and Department of Treasury.

7.      This Court has supplemental jurisdiction over the state consumer protection law claims pursuant to New York General Business Law § 349 under 28 U.S.C. § 1367.

## VENUE

8.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial portion of the unlawful practices giving rise to the claims

herein occurred within the Eastern District of New York.

## PARTIES

8.    Ms. Mary Perez is 48 years old and resides at 169 Bradford St., #3, Brooklyn, NY 11207.

9.    Ms. Jazmin Unruh is 29 years old and resides at 111 Richardson Street, #2r, Brooklyn, NY 11211.

10.    Mr. Claude Reed is 72 years old and resides at 650 E 22nd St, Brooklyn, NY 11210.

11.    Ms. Pamela Grace is 69 years old and lives at 131 West 130th Street, #1, New York, NY 10027.

12.    Mr. Daniel Perry is 63 years old and resides at 165 Henry Street, #603, New York, NY 10002.

13.    Mr. Saibou Sidibe is 52 years old and resides at 537 Tinton Avenue, Apt. #22, Bronx, NY 10455.

14.    Ms. Jacqueline Chretien is 37 years old and resides in a domestic violence shelter in the Bronx, New York.

15.    Ms. Catherine Assanah is 49 years old and resides at 177 Ridgewood Ave, Brooklyn, NY 11208.

16.    Ms. Melissa Escudero is 29 years old and resides at 436 Eastern Pkwy. #5F, Brooklyn, NY 11225.

17.    Defendant Miguel Cardona is the Secretary of the United States Department of Education, the federal agency of the United States government responsible for administering the

federal student financial aid program, 20 U.S.C. § 1071 *et seq*., including the student loan Consolidation and Income-Driven Repayment plans.  Defendant Cardona will be referred to hereinafter as "Department of Education" or "DOE."

18.     Defendant Janet Yellen is the Secretary of the United States Department of Treasury, the agency responsible for administering the Treasury Offset Program.  Defendant Yellen will be referred to hereinafter as "Treasury."

19.     Defendant Coast Professional, Inc. (hereinafter "Coast") is a debt-collection firm hired by the Department of Education to collect defaulted loans.  Its principal place of business is 4273 Volunteer Road, Geneseo, NY 14454.

20.     Defendant Maximus Federal Services, Inc. (hereinafter "Maximus") is a debt-collection firm hired by the Department of Education to collect and service defaulted student loans on DOE's Debt Management Collection System ("DMCS").  Its principal place of business is 1891 Metro Center Drive, Reston, VA 20190.

## FACTUAL BACKGROUND

### Defaulted Student Loans

21.     A federal student loan goes into default if no payment is received for a total of 270 consecutive days.

22.     Defaulted loans held by DOE are sent to its debt collection arm, the Debt Management Collection System ("DMCS").

23.     Since at least 2013, DOE has contracted with Defendant Maximus to run DMCS.

24.     DMCS (hereinafter DMCS/Maximus) collects on defaulted loans held by DOE and provides advice to borrowers on how to remedy defaults.

4

25.     The consequences of default are severe and include referral of the debt to Treasury for offset.

26.     The Treasury Offset program intercepts payments that one federal agency owes to an individual and redirects all or a portion of that payment to a creditor agency to whom that individual owes money.

27.     In 2015, 173,000 Social Security recipients had their monthly checks offset for defaulted student loans. General Accounting Office, *GAO- 17-45, Social Security Offsets: Improvements to Program Design Could Better Assist Older Student Loan Borrowers with Obtaining Permanent Relief*, p.10 (December 2016) (Hereinafter *GAO Offset Report*), available at https://www.gao.gov/assets/690/681722.pdf.  Many of these defaulted borrowers—67,300—lived below the Poverty Line, or were driven below the Poverty Line, when DOE offset their Social Security.  *Id.* at 27.

28.     But the largest category of withheld payments for defaulted student loans is tax refunds.  In 2019, DOE offset, i.e. intercepted, the tax refunds of 1.4 million defaulted student loan borrowers.  Annie Nova, CNBC Personal Finance, *the government took single mom's $3,063 tax refund to cover her student loans* (April 23, 2019), available at https://www.cnbc.com/2019/04/23/more-student-loan-borrowers-are-getting-their-tax-refunds-seized.html.

29.     A borrower seeking the return of a tax refund that DOE has already offset will not get it back unless facing eviction, foreclosure, or some "extreme hardship" for which they can provide proof.  FSA, *PCA Procedures Manual*, p. 165 (May 10, 2016), (hereinafter *FSA

*Collections Manual*) available at https://www.governmentattic.org/33docs/EDpcaManual_ 2016.pdf.

30.     Many intercepted tax refunds include Earned Income Tax Credits and Child Tax Credits designed to bring working families out of poverty.

### Getting out of Default: Rehabilitation and Consolidation

31.     Because the consequences of student loan default are severe, and few defaulted borrowers can pay-off their loans with a payment plan, Congress provided two methods by which to cure defaults.

32.     The first method for curing a default is called "Rehabilitation."  20 U.S.C. § 1078-6.  Rehabilitation requires nine "reasonable and affordable" monthly payments over ten months, after which the loan is brought current. 34 C.F.R. § 682.405(a)(2), 34 C.F.R. § 685.211(f)(1).

33.     "Reasonable and affordable" is defined as the payment amount required under an Income-Driven Repayment plan called Income-Based Repayment ("IBR"). 34 C.F.R. § 682.405(b)(1)(iii) and 34 C.F.R. § 685.211(f)(3).

34.     Under IBR, a "reasonable and affordable" payment for a borrower with income below 150% of the poverty line of her family size (e.g. $19,320 for a family of one) is $5 a month.

35.     Moreover, a Rehabilitation payment for those with income above 150% can be set as low as $5 a month when a borrower documents financial hardship.  34 C.F.R. § 682.405(b)(1)(iii) and 34 C.F.R. § 685.211(f)(3).

36.      Nearly 80% of borrowers who rehabilitate their defaulted loans are so financially distressed that they qualify for the $5 monthly payments.  Annual Report, CFPB Student Loan

6

Ombudsman, *Transitioning from Default to an Income-Driven Repayment Plan*, 22 (Oct. 2016),

(Hereinafter, *CFPB 2016 Report*) available at

https://files.consumerfinance.gov/f/documents/102016_cfpb_Transmittal_DFA_1035_Student_L
oan_Ombudsman_Report.pdf .

37.     While Rehabilitation can result in very low payments, it is time consuming, taking

at least nine months to complete.  During that time, the borrower remains subject to DOE

enforcement actions such as tax refund intercepts and Social Security offsets.

38.     Few borrowers understand that collections continue while they are making their

Rehabilitation payments.

39.      Indeed DOE admonishes its collectors that the "most common complaint" it

receives about collectors is that the collector "told the borrower offsets can be avoided by

making payments."  *FSA Collections Manual* at 163.

40.     Furthermore, Rehabilitation requires both timely and consecutive payments.  34

C.F.R. § 682.405(a)(2).  Two late or missed payments remove a borrower from the

Rehabilitation program, after which the borrower must start over their nine payments to complete

the program.

41.     According to the terms of the Rehabilitation program, once a loan is brought out

of default, it reverts to the expensive, standard repayment plan (full repayment of loan over ten

years) even if the borrower was paying only $5 a month to get out of default.  34 C.F.R. §

682.405(a)(2).

42.     Borrowers who rehabilitate their loans can enroll in Income-Driven Repayment

plans, whereby their monthly payment is set as low as 10% of their discretionary income.

Discretionary income is defined as income above 150% of the poverty line of the borrower's family size.  If the borrower's income is below that threshold, the payment is $0.00 a month for the next year, after which it gets readjusted if the income goes up.

43.     However, many borrowers who rehabilitate their loans out of default do not understand that IDR is option and, unable to pay the standard payment, re-default. CFPB Student Loan Ombudsman, *Transitioning from Default to an Income-Driven Repayment Plan*, 6 (May 16, 2017), available at https://files.consumerfinance.gov/f/documents/201705_cfpb_Update-from-Student-Loan-Ombudsman-on-Redefaults.pdf.

44.     The second Congressionally-created program that brings a loan out of default, and is the basis of this suit, is called Consolidation.  20 U.S.C.A. §§ 1087e(g), 1078-3(a)(3)(A)(ii)(III).

45.     Consolidation is available to almost all borrowers in default.

46.     Consolidation is vastly superior to Rehabilitation for avoiding offsets.

47.     Consolidation takes only one to two months to complete, requires no up-front payments, automatically puts the borrower in an IDR plan, and is easy to apply for.

48.     Indeed, the U.S. Consumer Financial Protection Bureau ("CFPB") advises defaulted borrowers that "if you cannot afford to repay your loan in full, **Consolidation is the fastest way to get out of default** . . . ." CFPB, *Do You Want to get out of default?* (June 23, 2021) (emphasis supplied), available at https://www.consumerfinance.gov/ask-cfpb/should-i-consolidate-my-federal-loans-en-603/

49.     Student loan experts agree.  "Overall, Consolidation is much faster than Rehabilitation, mainly because a borrower in default does not have to make any preliminary

payments to qualify."  National Consumer Law Center, *The Student Loan Default Trap*, 22, (July 2012), available at https://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/student-loan-default-trap-report.pdf .  "A much better option [than Rehabilitation] for a distressed borrower would be to consolidate . . . ." John R. Brooks & Adam J. Levitin, *Redesigning Education Finance: How Student Loans Outgrew the "Debt" Paradigm*, 109 GEOLJ 5 at *60 (2020).

50.     Consolidation requires the borrower to make "arrangements to repay the obligation on the defaulted loans satisfactory to the holders of the defaulted loans."  20 U.S.C.A. § §1078-3(a)(3)(A)(ii)(III).

51.     In the past, DOE's regulations defined "satisfactory repayment arrangement" as making three consecutive, on-time monthly payments that DOE deemed "reasonable and affordable" in light of the defaulted borrower's financial circumstances.  34 C.F.R. § 685.102(b).

52.     By 2012, the definition of "satisfactory repayment arrangement" was expanded to include no up-front payment as long as the borrower agreed to repay the new "Direct Consolidation Loan under one of the income-[][driven] repayment plans. . . . "  34 C.F.R. §§ 685.102(b) and 685.220(d)(1)(i)(A)(3).

53.     Moreover, for a struggling borrower who lives below 150% of the poverty line, the payment after Consolidation is $0.00 until the borrower's income increases.

54.     Consolidation thus ensures that low-income borrowers stay current on their loans and keep their safety-net income such as Social Security or Earned Income or Child tax credits.

**DOE Pushes Rehabilitation Over Consolidation**

55.     While Consolidation is unequivocally the best option for low-income student loan

borrowers, DOE continues to push the Rehabilitation option for outdated reasons that benefit debt collectors at the expense of borrowers.

56.     DOE pays a far higher commission to collectors who bring a loan out of default through Rehabilitation.

57.     Debt collectors receive $1,300 to $1,710 in commissions when the borrower is brought out of default through Rehabilitation, as compared to only $250 for Consolidation, according to the CFPB and other consumer watchdogs.

58.     Rehabilitation also enables the collector to retain the borrower's account for nine additional months or more, during which DOE pays the collector servicing fees.

59.     In addition, 20% of each of the nine monthly payments made towards Rehabilitation is given to the debt collector, further incentivizing debt collectors to encourage the Rehabilitation option to borrowers.  FSA, Loan Servicing and Collection Frequently Asked Questions, CF-Q2 (Jan. 8, 2016), available at: https://fsapartners.ed.gov/knowledge-center/faqs/loan-servicing-and-collection-frequently-asked-questions.

60.     In contrast, Consolidation hurts the collector's bottom-line because: consolidated loans exit the Collector's servicing portfolio one or two months after the borrower files the Consolidation application; and Consolidation requires no up-front payment and hence generates no collection fees to the debt collector.

61.     As a result of these Rehabilitation incentives, in 2016, 70% of loans brought out of default were brought out through Rehabilitation.  Annual report of the CFPB Student Loan Ombudsman, *Transitioning from Default to an Income-Driven Repayment Plan*, 19 (Oct. 2016), (Hereinafter, *CFPB 2016 Report*) available at https://files.consumerfinance.gov/f/documents/

[102016_cfpb_Transmittal_DFA_1035_Student_Loan_Ombudsman_Report.pdf](102016_cfpb_Transmittal_DFA_1035_Student_Loan_Ombudsman_Report.pdf) .

**DOE's Defective Due Process Notices Mislead Student Loan Borrowers About Their Options to Consolidate Their Loans**

62.     Like its incentive payments, DOE's notices, while purportedly providing due process, instead steer student loan borrowers to less favorable Rehabilitation program, to their financial detriment.

63.     Before DOE refers a defaulted student loan to Treasury for offset, DOE must provide the borrower with notice that satisfies due process.

64.     DOE purports to provide notice with three different forms (collectively referred to hereinafter as "due process notices") which, on information and belief, are mailed simultaneously to the borrower: (1) one of two default notices; (2) a four-page notice; and (3) a "Request for Review" form.

65.     As discussed below, DOE's due process notices fail on their face, omitting key information about how to avoid offset through Consolidation, while misleadingly steering borrowers to Rehabilitation, which is likely to subject borrowers to an offset.

**1.  The default notice misleads borrowers about Consolidation options.**

66.     The first of the three notices that comprise DOE's due process notices is the default notice.  DOE uses two different default notices (Exhibits A and B) that are substantially the same.

67.     The default notices state that the debt will be referred to the Treasury's offset program, which will take tax refunds and Social Security payments.

68.     The default notice titled "Debt Statement" states that, "under some circumstances you may become eligible for loan Rehabilitation or payoff through Consolidation by paying your debt by a mutually agreeable installment plan, which would remove your loan(s) from default status."  Exhibit A.

69.     This is the only use of the word "Consolidation" in the notice of default titled "Debt Statement."  Exhibit A.

70.     Similarly, the other, untitled default notice states "that paying your debt by a mutually agreeable installment plan may make your loan(s) eligible for loan Rehabilitation or payoff through Consolidation, which will remove your loan(s) from default status."  Exhibit B.

71.     These default notices misleadingly suggest that Consolidation requires DOE and the borrower to agree on a repayment plan—implying negotiation is necessary—and that the borrower must pay the entire debt through that repayment plan.

72.     In reality, these are not the requirements for a Consolidation, and the description in the default notice is misleading.

73.     In fact, Consolidation allows student loan borrowers to bring their loans out of default within 30 to 60 days without negotiating a "mutually agreeable installment plan," and, indeed, without requiring even a single payment.

**2.  Consolidation is not mentioned in DOE's four-page notice.**

74.     The second of the three notices that comprise DOE's due process notices is the four-page notice (Exhibit C) titled ***NOTICE OF PROPOSED . . . TREASURY OFFSET AGAINST ALL PAYMENT STREAMS CURRENTLY AUTHORIZED . . .OR . . . AUTHORIZED IN THE FUTURE.***

75.     The four-page notice states that the borrower can avoid offset by: paying the debt in full; establishing "an approved repayment agreement" or making a timely, valid objection to enforcement of the debt.

76.     Page 2 lists the objections that can be raised, including the validity of the debt, the existence of a payment arrangement that has not been breached, and numerous statutory defenses, including those applicable to borrowers who were deceived or defrauded by a school.

77.     The notice then reiterates that the borrower can avoid "Treasury offset [by agreeing] to pay the debt under terms accepted by the Department" for which a 1-800 number to DMCS/MAXIMUS is provided. Exhibit C, emphasis in the original.

78.     Nowhere in this four-page notice does DOE state that the vast majority of borrowers have a statutory right to consolidate their loans out of default without making a single payment.

79.     The word "Consolidation" does not appear even once in the four-page notice.

### 3. The "Request for Review" form is silent regarding Consolidation and steers the borrower to Rehabilitation.

80.     Attached to the default notice and four-page notice is a two-page form titled "Request for Review."  Exhibit D.

81.     At the top, the Request for Review form clarifies:

> If you object ONLY because . . . you cannot afford to pay this debt . . . DO NOT USE THIS FORM. INSTEAD, write or call the Contact listed on the Debt Statement [notice of default, i.e. DMCS/Maximus].

> Exhibit D (Capitalization in original).

82.     Consolidation is nowhere mentioned as a solution for those who "cannot afford to pay this debt" and want to avoid offset, even though Consolidation is a statutory lifeline intended

to help financially distressed borrowers with no up-front payments and Income Driven payments as low as $0.00 a month thereafter.

**The Notices Are Sent to Stale Addresses, Even Though DOE Is Authorized
to Use More Current IRS Addresses**

83.     Due process requires that a creditor agency make a reasonable attempt to inform the debtor of its pending action so that he can raise any objections.

84.     Tax refunds are the most likely income stream that DOE will offset.  For example, in 2015, 91% of DOE income from offsets came from tax refunds.  *GAO Offset Report*, p.18.

85.     Although DOE is authorized by Treasury and Congress to use IRS records to locate the current address of a borrower to whom it intends to mail its due process notices, 31 C.F.R. § 285.2(c)(2)(i), DOE mails its notices not to the address a debtor has provided the IRS, but instead to the "current address" DOE has in its records.  34 C.F.R. § 30.22(a)(2).

86.     Sometime this "current address" is the address where the borrower lived when the student loan was originated, and no longer resides.

87.     Americans move frequently.  In 2019, nine (9) percent of Americans moved at least once, according to census data. See U.S. Census, Table A-1, *Annual Geographic Mobility Rates, By Type of Movement: 1948-2020*, (Dec. 2020), available at https://www.census.gov/data/tables/ time-series/demo/geographic-mobility/historic.html.

88.     However, Treasury's regulations provide that failure to actually receive the mailed notices from DOE does not protect the borrower from offset, even if the creditor agency could get an updated address from the IRS.  31 C.F.R. § 285.2(c)(2)(i).

89.     Moreover, DOE provides notice of its intent to offset only once.  31 C.F.R. §
285.2(d).  For this reason, in some cases, many years may pass between the mailing of DOE's
notices and the borrower's eligibility for a tax refund, which is then taken.

### Treasury's Post-Offset Notice Fails to Mention Consolidation and Steers Borrowers to Rehabilitation

90.     When a borrower's tax refund is offset to pay for a student loan debt, Treasury
sends a post-offset notice bearing the heading *What Happened to My Payment.* (Attached as
Exhibit E.)

91.     Treasury's post-offset notice is sent to the address listed on the borrower's most
recent tax filing that generated the tax refund.

92.     For borrowers who have moved without updating their address with DOE,
Treasury's post-offset notice is their first notice—albeit too late—of default and the risk of
offset.

93.     The post-offset notice directs the defaulted borrower to contact DMCS/Maximus,
who, on information and belief, will steer the borrower to Rehabilitation options consistent with
the financial incentives Treasury has provided.

94.     Because Rehabilitation, while inexpensive, requires timely payments, many
borrowers who enter Rehabilitation will fail to complete it and, no knowing about Consolidation,
will remain in default for another year, losing a second tax refund unnecessarily.

### Treasury Refuses to Provide Notice of Due Process Before Taking a Borrower's Tax Refund

95.     DOE tells Treasury where it sent the due process notices when it certifies the
borrower's debt for offset.  31 C.F.R. 285.5(d)(5).

96.     The borrower also tells Treasury where the borrower *actually* lives when she files her tax return whose refund is slated for offset.

97.     Treasury has authority to delay issuing a refund so as to ensure due process.  Yet Treasury does not send a pre-offset notice to the address in its database—which is updated with corrected addresses compared to the ones used by DOE—to ensure that the borrower is aware that her property is about to be taken and that she has statutory rights that can protect that refund from offset, even when it is clear prior notice was sent to a stale address.

98.     Upon information and belief, Treasury knows the approximate date that DOE sent its due process notices, which is a few months prior to the date Treasury receives the offset certification from DOE.  31 C.F.R. § 285.5(d)(1).

99.     Moreover, Treasury is aware when more than a year has passed since the due process notices were issued because DOE must issue an annual certification after the first certification.  31 C.F.R. 285.5(d)(7).

100.    Despite this capacity to ensure due process by identifying borrowers who may have never received DOE's due process notices or who may have received such notice years before, Treasury does not issue a pre-offset notice before taking the tax refund.

**Treasury's Pre-Offset Notice to Social Security Recipients**
**Does Not Apprise Recipients of Their Options**

101.    Prior to initiating a Social Security offset, Treasury sends a pre-offset notice, titled *Funds May Be Withheld from Your Social Security Benefit Payment*, to the defaulted borrower.  Sample notice attached as Exhibit F.

102.    Treasury's pre-offset notice is sent twice:  60 days before the proposed offset and then 30 days before the proposed offset.  *GAO Offset Report,* 5.

16

103.    Under the heading *How Can I Stop This*, the notice reads: "To prevent this collection action, you must contact the agency listed below and meet its requirements."

104.    For defaulted loans held by DOE, the agency to contact is DMCS/Maximus (although it is identified as "U.S. Department of Education, Federal Offset Unit").

105.    Upon information and belief, consistent with the financial incentives established by DOE, Defendant Maximus will not advise the borrower that she can Consolidate her loans out of default, but instead will advise her to Rehabilitate her loans so that Maximus or DOE's collector can earn additional income.

106.    The pre-offset notice does not divulge the Consolidation option as a statutory right that can avert offset, or that this option would permit the borrower to pay $0.00 a month if her income is below 150% of the poverty line.

107.    On information and belief, such information if included in Treasury's pre-offset notice, would enable a Social Security recipient to keep most, if not all, of her safety net payments.

108.    Indeed, one-third of defaulted borrowers whose monthly checks are offset by DOE lived at or below the poverty line, *GAO Offset Report,* p. 27, n. 5, and hence could retain all of their Social Security payments if so-advised in the Treasury's pre-offset notice.

109.    While the pre-offset notice does inform borrowers with disabilities of their right to apply for a disability discharge to avoid offset, more than 25% of defaulted borrowers receiving Treasury's pre-offset notices are retirees who may not be disabled. *GAO Offset Report,* pp. 11, 55.

## FACTS RELATING TO PLAINTIFFS

### Plaintiff Mary Perez

110.    Mary Perez ("Ms. Perez") is a 48-year-old, single parent of two children and the primary caretaker of her elderly mother, all of whom live with her.

111.    Ms. Perez supports her family as an $18 per-hour, breakfast hostess.  She works part-time because business remains slow due to the Covid-19 pandemic.

112.    In 2008, Ms. Perez enrolled in a two-year, business program at a for-profit college.

113.    Ms. Perez borrowed $22,470 in federal loans to attend even though she also received over $16,000 in federal, need-based grants called Pell due to her low-income.

114.     Ms. Perez's degree did not increase her earnings despite assurances by the for-profit college.

115.    Pressed financially, Ms. Perez defaulted on her loan payments.

116.    On May 13, 2019, DOE sent Ms. Perez its four due process notices.

117.    After reading them, Ms. Perez thought her only option was to pay the entire amount that she owed, which she could not afford to do.

118.    Had the notices divulged that she could avoid referral to Treasury's offset program by bringing the loan current through Consolidation, Ms. Perez would have done so.

119.    Sometime shortly after sending Ms. Perez the due process notices, DOE retained a non-defendant collector.

120.    On September 30, 2019, the non-defendant collector wrote Ms. Perez that "Rehabilitation" was a "solution" to her defaulted loan problem.

121.     The non-defendant collector's letter did not mention that Ms. Perez could consolidate her loan out of default within a matter of weeks without a single payment, or that she could avert offset by availing herself of that statutory right.

122.     Ms. Perez did not respond to the letter because her finances were precarious and the letter stated that Rehabilitation required nine payments.

123.     On February 20, 2020, Treasury offset her $6,516 refund, sent it to DOE, and sent its post-offset notice to Ms. Perez that failed to mention Consolidation as quick and inexpensive path out of default.

124.     On April 7, 2020, Ms. Perez called DMCS/Maximus, and explained that she needed her refund because she was unemployed due to Covid-19.  Defendant Maximus advised that her refund could not be returned unless Ms. Perez was facing eviction or foreclosure.

125.     Ms. Perez has since entered the Consolidation program, and has remained current on her loans through an Income-Driven Repayment Plan.

126.     Because of  the actions and omissions of DOE and Treasury, Ms. Perez was not able to take advantage of the Consolidation program until 2020.

127.     Ms. Perez was injured by the loss of her tax refund.  She needed it to pay her daughter's parochial school tuition, as well as to replenish her savings account for emergencies. After losing her job due to Covid in March 2020, she quickly ran out of money and had to ask for help to feed her children from her ex-partner and a neighbor who referred her to a food bank. This caused embarrassment and humiliation.

128.     Ms. Perez seeks the return of her tax refund, but not any damages, from the federal Defendants.

**Plaintiff Jazmin Unruh**

129.    Jazmin Unruh ("Ms. Unruh") is 29 years old.  She works part-time in a funeral home.

130.    From 2014 to 2016, Ms. Unruh attended an arts college in Georgia.  Although she qualified for $12,830 in need-based Pell grants, she still needed more than $13,000 in federal loans to pay for school.

131.    In January 2016, Ms. Unruh stopped college for financial reasons and worked in a coffee shop in Savanah, Georgia.

132.    In May 2016, her obligation to repay her loans began.  Lacking a degree, she was unable to secure a well-paying job with which to repay her loans.

133.    In April 2017, Ms. Unruh moved to Ashville, North Carolina.

134.    On or about June 20, 2017, DOE sent Ms. Unruh its due process notices to the last address it had on record—her parent's home in New Jersey.

135.    Because Ms. Unruh was living in North Carolina at the time, she did not receive the pre-offset notices and was unaware of the consequences of default.

136.    In early 2018, Ms. Unruh filed her 2017 tax return, for which she was entitled to a $628 refund and provided her new, Brooklyn, address as her residence.

137.    Treasury knew or should have known that DOE sent Ms. Unruh's due process notices to an address other than where she presently lived.

138.    Nevertheless, Treasury did not delay the refund nor issue a pre-offset notice to Ms. Unruh in Brooklyn that accurately advised Ms. Unruh of her rights, including Consolidation, so as to provide due process.

139.    On or about February 9, 2018, Treasury offset her $628 tax refund.

140.    Had Treasury (or DOE) sent a pre-offset notice that accurately explained Consolidation to the Brooklyn address Ms. Unruh provided on her 2017 return, and had Treasury deferred issuing the refund so she could respond, Ms. Unruh would have exercised her due process rights and consolidated her loans out of default to avoid the tax refund offset of $628.

141.    On or about February 9, 2018, Treasury sent a post-offset notice Ms. Unruh in Brooklyn which did not mention Consolidation, but instead directed her to call DOE's offset unit at DMCS/Maximus.

142.    On or about February 20, 2018,  Ms. Unruh called DMCS/Maximus and was connected to Defendant Coast.  Coast's representative incorrectly advised Ms. Unruh that Rehabilitation was her only option to get out of default and to avoid future offsets.

143.    Because Ms. Unruh's low income, Defendant Coast set her Rehabilitation payments at $10.00 per month, of which, on information and belief, Coast took $1.98 as its commission.

144.    By steering Ms. Unruh to Rehabilitation, Coast insured that it received servicing fees from DOE for at least nine additional months.

145.    Had Defendant Coast advised Ms. Unruh that she could quickly consolidate her loans out of default without making any payments, Ms. Unruh would have done so, depriving Coast of commissions and monthly servicing fees, while protecting Ms. Unruh from future offsets.

146.    Ms. Unruh made her Rehabilitation payments from February 20, 2018 through June 20, 2018.

21

147.     In August and September 2018, Ms. Unruh missed two monthly Rehabilitation payments after she lost her wallet and was forced to cancel her debit and credit cards.

148.     Shortly after missing her payments, Ms. Unruh spoke with Coast, yet Coast's representative again did not tell Ms. Unruh she could quickly bring her loans current and without any payment through Consolidation.

149.     Unaware of Consolidation, Ms. Unruh resumed her Rehabilitation payments of $10.00 a month on October 17, 2018.

150.     In February 2019, Ms. Unruh filed her 2018 tax return for which she was due a refund of $512 that included an Earned Income Tax Refund because she lived in poverty.

151.     On February 26, 2019, and for a second time, Treasury intercepted Ms. Unruh's tax refund without any pre-offset notice.  For a second time, Treasury sent Ms. Unruh only a post-offset notice addressed to her 2018 tax filing address in Brooklyn without providing a due process notice *before* the offset.  Again, Treasury's post-offset notice failed to mention Consolidation as quick and inexpensive path out of default.

152.     Had Treasury (or DOE) sent a pre-offset notice to Ms. Unruh at the address provided on her 2018 tax filing, and had that notice included accurate information regarding her ability to get out of default and *actually* avoid tax refund offset through Consolidation, Ms. Unruh would have exercised that right.

153.     Thereafter, after having a second tax refund taken, Ms. Unruh continued to make $10 payments each month until September 2019.  For unknown reasons, she remained in default status despite making 11 consecutive monthly payments.

154.     In the fall of 2020, Ms. Unruh enrolled in mortuary school, was unable to secure

22

student loans because her federal loans remained in default, and incurred over $18,000 in tuition debt.

155.    On April 16, 2021, Ms. Unruh called Defendant Coast and asked how she could get out of default to requalify for federal loans.  Defendant Coast told her she could pay the full amount immediately, or pay the full amount in 90 days, or rehabilitate her loans over nine months.  Coast's representative again did not describe Consolidation as an option.

156.    On April 20, 2021, Ms. Unruh again called Defendant Coast and again asked about her options.  Again, Defendant Coast incorrectly stated that Mr. Unruh's only option other than payment in full was Rehabilitation.

157.    Ms. Unruh has since entered the Consolidation program, and has remained current on her loans through an Income-Driven Repayment Plan.

158.    Because of  the actions and omissions of the federal Defendants and Defendant Coast, Ms. Unruh was not able to take advantage of the Consolidation program until 2021.

159.    Ms. Unruh was injured by the above Defendants.  She went without necessities to pay her rent in 2018 and 2019 when her two tax refunds were taken.  She became liable for more than $18,000 in tuition and fees to the mortuary school due to her default status that Coast extended by misstating her options for getting out of default.  She unnecessarily paid Rehabilitation payments for many months when she could not afford to do so.  She worried that her April 2021 Consolidation application would not get her out of default given Coast's repeated statements that Rehabilitation was the only route out of default, other than full repayment.  And she was a remains unable to continue her mortuary school education (which she is half way through) without paying the over $18,000 debt caused by Defendants' actions and omissions.

23

160.    Ms. Unruh seeks the return of her tax refunds, but not any damages, from the federal Defendants, and seeks damages, including emotional damages, from Coast.

**Plaintiff Claude Reed**

161.    Claude Reed ("Mr. Reed") is a 72-years-old and supports himself on $900 in Social Security retirement benefits.

162.    In the early 1970's, Mr. Reed borrowed $3,300 in federal loans to attend the University of Wisconsin.

163.    Mr. Reed left college without a degree and worked as a journalist for the New York Amsterdam News as well as other jobs.

164.    Mr. Reed made piecemeal payments on all of his loans until 1993, when he defaulted.

165.    Sometime prior to 2003, DOE sent Mr. Reed its due process notices and certified Mr. Reed's debt for offset.

166.    Thereafter, DOE, on information and belief, annually recertified Mr. Reed's debt for offset.

167.    By November of 2013, DOE had offset about $3,800 in tax refunds.

168.    Trying to fix the problem to retain his tax refunds, Mr. Reed contacted DMCS/Maximus and was directed to Rehabilitate his loans out of default, even though Consolidation was cheaper and quicker.

169.    On December 19, 2013, Mr. Reed started making his $50 monthly Rehabilitation payments from which—on information and belief—Defendant Maximus kept approximately $11.79 as its collection fee.

170.    While Mr. Reed made his nine monthly Rehabilitation payments in 2013 and 2014, Defendant Maximus received servicing fees from DOE.

171.    Because a borrower is not removed from default status while making monthly Rehabilitation payments, Mr. Reed's upcoming tax refund remained in jeopardy.

172.    In early 2014, Mr. Reed filed his tax return in which he listed his address as 300 East 86th Street, # 1c, New York, NY 10028, where he rented a room.

173.    Although Treasury knew or should have known that Mr. Reed was no longer living at the address where DOE sent its due process notices sometime prior to 2003—over a decade before—Treasury did not send a pre-offset notice to Mr. Reed nor delay off-set.

174.    Instead, on May 7, 2014, Treasury intercepted Mr. Reed's 2013 tax refund of $489 and sent a post-offset notice to the East 86th Street address.  The post-offset notice failed to mention Consolidation as quick and inexpensive path out of default.

175.    Mr. Reed needed this tax refund because he lived from paycheck to paycheck and frequently had to borrow money to buy food and to pay bills.

176.    On November 21, 2014, Mr. Reed brought his loans out of default after making his last Rehabilitation payment.

177.    Shortly thereafter, on information and belief, DOE paid Defendant Maximus a commission of between $1,300 to $1,710 for rehabilitating Mr. Reed's loans.

178.    Unfortunately, after bringing his loans current, Mr. Reed's monthly student loan payment increased to an unaffordable amount because his loan reverted to a standard repayment plan (as Rehabilitation requires) with no assessment of affordability.

179.    Mr. Reed responded to the standard repayment plan by asking his non-defendant

25

servicer for a lower payment.

180.    Unbeknownst to Mr. Reed, he was eligible for a $0.00 per month, Income-Driven Repayment payment given his low income.

181.    However, instead of putting him in an IDR plan of $0.00 per month, the non-defendant servicer placed Mr. Reed in an Extended Repayment plan that he could not afford, causing him to re-default on October 4, 2015.

182.    By this time, Mr. Reed had moved twice, first to West 162nd Street (which address he provided to DOE's non-defendant servicer when trying to get his payment lowered) and later to 175th Street.

183.    On December 28, 2015, DOE sent Mr. Reed its due process notices regarding his re-default to an outdated address at West 162nd Street and he did not receive them.

184.    Over a year later, in early 2017, Mr. Reed filed his tax return, for which he was entitled a $352 refund, and provided the West 175th Street as his residence.

185.    On information and belief, Treasury knew or should have known that a discrepancy existed between where DOE sent its due process notices in 2015 and where he currently lived when filing his taxes in 2017.

186.    Despite the likely possibility that Mr. Reed was unaware that his $352 tax refund was in jeopardy due to this address discrepancy, Treasury did not delay processing the refund nor issue a pre-offset notice that appraised Mr. Reed of his rights and that his tax-refund was in jeopardy.

187.    Rather, Treasury offset the refund on February 23, 2017 and sent it to DOE.

188.    On information and belief, Treasury sent a post-offset notice, dated that same day,

26

to Mr. Reed at his West 175th Street address that, again, did not mention Consolidation.

189.    Shortly thereafter, Mr. Reed called DMCS/Maximus, complained about the lack of notice prior to the offset, and asked how he could avoid offsets in the future.

190.    Maximus did not tell Mr. Reed about Consolidation even though it was the only path out of default.  (Borrowers can rehabilitate only once.)  Instead, its representative directed Mr. Reed to apply for a reasonable and affordable repayment plan that purported to bring him out of default after nine payments, even though such protection was a legal impossibility.

191.    On March 15, 2017, Treasury sent a pre-offset notice to Mr. Reed indicating that his Social Security payments would be offset unless he took action.

192.    Although Treasury's pre-offset notice contained a heading *How Can I stop This?*, it did not mention Consolidation as a solution, but instead directed him to call DMCS/Maximus.

193.    In a letter, dated April 13, 2017, the then 67-year-old Mr. Reed pled with DOE to return "at least a portion" of the $352 tax refund because he didn't have "enough money to eat."

194.    Despite Mr. Reed's plea, DOE did not return any of his refund.

195.    On May 17, 2017, Mr. Reed's modest monthly Social Security check was offset by $132.90 despite his efforts in March to get out of default.  After paying rent, he had $23.10 in Social Security to live on, plus whatever commissions he could generate from his part-time job.

196.    From July 2017 through April 2018, Mr. Reed made "reasonable and affordable" monthly payments of $22.00 to DMCS/Maximus.

197.    During this time, DOE and Treasury continued to offset his Social Security as well as a $354 tax refund for tax year 2017.

198.    In April, 2018, Mr. Reed was forced to move. Although he had made more than

nine, consecutive payments on $22.00, he remained in default and the Social Security offsets continued. Facing homelessness, Mr. Reed started a "Go Fund Me" campaign and stopped paying the $22.00.

199.    Money trickled in from Brooklynites who knew him from the farmers' market where he had worked part-time, but not enough to keep him housed.

200.    During this time, Mr. Reed occasionally paid $80 a night to stay in a hostel that catered to budget travelers.

201.    Twice in 2018, Mr. Reed slept in an Emergency Room waiting-area to avoid the street.  Eventually, Mr. Reed stayed with his ex-wife in Brooklyn.

202.    Mr. Reed's Social Security continued to be offset in 2019 and early 2020, until DOE suspended debt collection due to the COVID-19 pandemic.

203.    In August of 2021, Mr. Reed again called DMCS/Maximus to ask how he could get out of default.

204.    Maximus' representatives noted that Consolidation was the only option (because he had already Rehabilitated his loans) but, inaccurately described the requirements of the program.

205.    Maximus representatives (one of whom was a supervisor) stated that Mr. Reed had to first fill out an income and expense form, after which Maximus would determine what was a  "reasonable and affordable"  payment, after which Mr. Reed would have to make three such monthly payments before he could file a Consolidation application.  Maximus' two representatives denied that he could forgo such payments by agreeing to enter an Income-Driven Repayment plan.

28

206.    Mr. Reed has since entered the Consolidation program, and has remained current on his loans through an Income-Driven Repayment Plan.

207.    Because of  the actions and omissions of the federal Defendants and Defendant Maximus, Mr. Reed was not able to take advantage of the Consolidation program until 2021.

208.    Mr. Reed was injured as a result.  He lost tax returns and Social Security payments and made $22 payments to Maximus that did not get him out of default, as he was misled to believe they would.  The offset caused hunger. In his 2017 letter to DOE Mr. Reed wrote that he had less than $8 a day to cover food for two weeks and that "I am FOOD CHALLENGED. . . . I have to borrow money to eat."  The offsets and fruitless $22 payments furthered his sense of vulnerability, deprived him of shelter he could have obtained at the hostel, and spurred public begging on his Go Fund Me page.

209.    Maximus' misrepresentations in 2021 also injured him by causing him to worry that his August 2021 Consolidation application would not get him out of default given Maximus' repeated statements that he must first make three, monthly payments.

210.    Mr. Reed seeks the return of his tax refunds and offset Social Security benefits, but not any damages, from the federal Defendants and seeks damages, including emotional distress damages, from Maximus.

### Plaintiff Pamela Grace

211.    Pamela Grace is 69 years old and lives alone in an apartment on West 130th Street, New York, NY.  She supports herself on Social Security and a pension.

212.    In 2008, after working more than twenty years as a Systems Engineer at Bell Labs, Ms. Grace went back to school to obtain new employment opportunities at New York

University.

213.    From 2008 to 2010, Ms. Grace took out $41,000 in federally insured loans.

214.    Unable to benefit from her NYU education, Ms. Grace struggled financially and defaulted on her loans in May 2011.

215.    Around July 2013, Ms. Grace interacted with a non-defendant collector retained by DOE and was counseled into entering into a $10.00 a month Rehabilitation plan, from which the DOE collector took a commission and earned additional servicing fees.

216.    The DOE collector did not advise Ms. Grace about the benefits of Consolidation.

217.    Struggling financially, Ms. Grace missed her seventh Rehabilitation payment in January 2014 and remained in default.

218.    In April 2014, Ms. Grace began receiving $1,500 in Social Security Retirement benefits.

219.    In early 2015, Treasury sent Ms. Grace pre-offset notices warning her that her Social Security would be taken, yet omitting important information about Consolidation.

220.     In April 2015, Treasury began to offset $245 from Ms. Grace's Social Security payment.  After each offset, Treasury sent Ms. Grace a post-offset letter but did not inform Ms. Grace that Consolidation was a quick and inexpensive path out of default.

221.    Ms. Grace called DOE's non-defendant collector to stop the offset,  was steered a second time to Rehabilitation, and thereafter continued to have her Social Security offset while making her rehabilitation payments of $5 a month.

222.    After completing her Rehabilitation in January 2016, Ms. Grace's monthly payment jumped from $5 per month to over $700 per month, as required by the terms of her

Rehabilitation.

223.    On information and belief, shortly thereafter, DOE paid the collector a commission of between $1,300 to $1,710 for rehabilitating Ms. Grace's loans.

224.    Unable to afford the increased payments, and confused by the change, Ms. Grace re-defaulted in early 2017, all the while she was eligible for an IDR payment of $0 through Consolidation.

225.    Sometime in 2017, DOE sent its due process notices for a second time, but did not apprise Ms. Grace that she could easily avoid offset of her Social Security by Consolidating her loans.

226.    From 2017 onward, Defendant Maximus, as DOE's contractor at DMCS/Maximus, initiated  all collection activities related to Ms. Grace's re-defaulted loans.

227.    On information and belief, in December 2018 and January 2019, Treasury sent Ms. Grace pre-offset notice warnings to Ms. Grace that her Social Security would be offset beginning in February 2019.

228.    The pre-offset notices failed to advise Ms. Grace that she could avoid offset through Consolidation.

229.    Thereafter, Treasury offset $216.90 a month from Ms. Grace's Social Security check from February 2019 through Feb 2020, until Social Security offsets were suspended due to the COVID-19 pandemic.

230.    Each monthly offset was followed by Treasury's post-offset notice that failed to advise that Consolidation was a quick and affordable path out of default.

231.    On November 16, 2021, Ms. Grace called DMCS/Maximus and asked how she

could get out of default to avoid offset given she had already Rehabilitated her loans.

232.   Maximus' representative inaccurately described the requirements of Consolidation, denying that Mr. Grace could forgo the three initial monthly payments and immediately consolidate by agreeing to enter an Income-Driven Repayment plan and stating incorrectly that Ms. Grace had to take further steps to apply for and enter the program.

233.   On November 22, 2021, Ms. Grace spoke with a different Maximus representative who inaccurately stated that three monthly payments were needed before Ms. Grace could consolidate her loans out of default.

234.   Ms. Grace has since entered the Consolidation program, and has remained current on her loans through an Income-Driven Repayment Plan.

235.   Because of  the actions and omissions of the federal Defendants and Defendant Maximus, Ms. Grace was not able to take advantage of the Consolidation program until January 5, 2022.

236.   Because of  the actions and omissions of the federal Defendants and Maximus, Ms. Grace was injured when her Social Security was offset. The loss of Social Security prevented her from buying clothes including undergarments which caused her to feel badly about herself. It limited her ability to socialize, which made her feel isolated and depressed.  She could not afford a taxi to get to the store, and instead had to rely on neighbors for rides, some of whom made negative comments about the condition of her clothes and others who made her feel that she was receiving charity.  Her chronic lack of funds eventually resulted in her having to leave her home in 2020, which was stressful.

237.   Ms. Grace was also harmed by the actions and omissions of Maximus in 2021.

She worried that her November 2021 Consolidation application would not get her out of default given Maximus' contrary statements regarding the Consolidation requirements. She worried that if Maximus was right, her Social Security would be offset again.

238.    Ms. Grace seeks the return of her Social Security payments, but not any damages, from the federal Defendants, and seeks damages, including emotional distress damages, from Maximus.

### Plaintiff Daniel Perry

239.    Daniel Perry is 63 years old and works as a photographer, actor, and other jobs.

240.    In 1978, Mr. Perry enrolled at a prestigious art school in Philadelphia, borrowed $10,800 in student loans, and graduated with a BFA in photography.

241.    Despite his degree, Mr. Perry was unable to find consistent work.  Consequently, Mr. Perry defaulted on his loans in 1983, which, by 1994, were held by DOE.

242.    Thereafter, various private debt collectors retained by DOE wrote and called Mr. Perry.  When answering their calls, Mr. Perry always updated his address.

243.    Following September 11, 2001, Mr. Perry's financial situation worsened, necessitating a move and mental health treatment.  Thereafter Mr. Perry moved many times, sometimes for work opportunities, other times because he could not afford to pay rent.

244.    Prior to 2008, DOE sent its due process notices to an address where Mr. Perry no longer lived and certified Mr. Perry's debt for offset with Treasury.

245.    Upon information and belief, DOE's certification to Treasury included the address to which DOE sent Mr. Perry its due process notices.

246.    In early 2008, Mr. Perry filed his tax return and provided an address to the IRS on Steuben Street, Brooklyn, New York as his residence.

247.    Thereafter, Treasury offset Mr. Perry's tax refunds in 2008 ($121), 2009 ($404), 2013 ($28), 2014 ($395), 2015 ($458), 2017 ($554.09) and 2018 ($929.00 which included an Earned Income Tax Credit due to Mr. Perry's impoverishment).

248.    Although, Treasury knew or should have known that Mr. Perry no longer lived at the address where DOE sent its pre-2008 due process notices, Treasury did not issue pre-offsets notices prior to any of these offsets advising Mr. Perry that he could consolidate his loans out of default to protect his tax refunds.

249.    Nor did Treasury's post-offset notices advise him of this right.

250.    Mr. Perry has since entered the Consolidation program, and has remained  current on his loans through an Income-Driven Repayment Plan.

251.    Because of the federal Defendants' actions and omissions, Mr. Perry was not able to take advantage of the Consolidation program until 2018.

252.    The actions and omissions of the federal Defendants injured Mr. Perry when his tax refunds were taken.  The offsets left Mr. Perry despondent and in despair. At the time of the 2017 offset, Mr. Perry needed the $554.09 refund because he was food deprived and on the brink of homelessness.  The loss of the $929 refund in 2018 was similarly devastating to Mr. Perry who: frequented food banks; was behind on his rent; feared homelessness; and worried that he would lose his possessions if he became homeless.

253.    Mr. Perry seeks the return of his tax refunds, but not any damages, from the federal Defendants.

**Plaintiff Saibou Sidibe**

254.    Saibou Sidibe ("Mr. Sidibe") is 52-years-old and lives with his wife and two minor children. He works at a non-profit and occasionally drives an Uber.

255.    Mr. Sidibe earned an undergraduate degree in the Ivory Coast, after which he immigrated to the United States.

256.    In 2009, Mr. Sidibe enrolled in an MBA program at for-profit DeVry University. DeVry told Mr. Sidibe that its graduates obtained lucrative jobs and it would help him do so as well.

257.    Accordingly, Mr. Sidibe borrowed $84,503 in federal loans to pay for two years of for-profit tuition.  While at DeVry, he drove a taxi and worked in a cell phone store to support his family.

258.    Despite completing his MBA, DeVry did not help Mr. Sidibe secure a job. DeVry was later sued by numerous federal agencies, state attorneys general and private litigants for defrauding its students.

259.    Mr. Sidibe struggled to repay his loans, and eventually defaulted on them in 2018.

260.    On or about March 30, 2018, DOE sent its due process notices, which included a notice of default.

261.    Mr. Sidibe read the notices and was fearful of the consequences of default, but did not learn about Consolidation as a quick and affordable path out of default because the notices did not include this information.

262.    Mr. Sidibe called the number on DOE's notices, spoke with a non-defendant collector retained by DOE.  The collector did not tell Mr. Sidibe about, and instead steered him into Rehabilitation.

263.    On July 23, 2018, Mr. Sidibe made his first of nine, consecutive, on-time payments of $10 per month.

264.    Thereafter, the non-defendant collector earned servicing fees on Mr. Sidibe's account as well as commissions on each of the $10 payments.

265.    On March 23, 2019,  Mr. Sidibe filed his 2018 tax return, for which he was due a $2,698 refund, including a Child Tax Credit.

266.    On March 25, 2019, Mr. Sidibe made his last of nine, consecutive, on-time payments of $10, thereby successfully Rehabilitating his loan.

267.    Despite making these payments, DOE did not de-certify his account for offset with Treasury.

268.    On April 1, 2019, Treasury offset his $2,698 tax refund and sent Mr. Sidibe a post-offset notice that omitted Consolidation as a way to avoid future offsets.

269.    Had Mr. Sidibe known he was eligible for Consolidation, he would have consolidated his debt and brought current his student loans in July 2018 to prevent the financial and emotional hardship his family suffered when his income tax refund was intercepted in April 2019.

270.    In response to the interception of his 2018 tax refund, Mr. Sidibe called the non-defendant-collector and was told the tax offset was proper and could not be undone.

271.    Upon information and belief, DOE paid a Rehabilitation commission of between $1,300 and $1,710 to the non-defendant-collector that the collector would not have earned had Mr. Sidibe consolidated his loans.

272.    In June 2019, Mr. Sidibe learned that his monthly student loan payment would soon jump from $10 per month to over $1,500 per month due to the terms of his Rehabilitation. In contrast, his income would have qualified him for a $218 payment in an Income-Driven Repayment Plan if he had Consolidated.

273.    Furthermore, most of Mr. Sidibe's rehabilitated loans were ineligible for the Public Service Loan Forgiveness ("PSFL") program because Rehabilitation, unlike Consolidation, does not transform ineligible loans to PSLF eligible loans.

274.    Mr. Sidibe has since entered the Consolidation program, and has remained current on his loans through an Income-Driven Repayment Plan.

275.    Because of the federal Defendants' actions and omissions, Mr. Sidibe was not able to take advantage of the Consolidation program until 2019.

276.    The actions and omissions of the federal Defendants injured Mr. Sidibe.  His family was angry with him and disappointed by its loss.  His 7-year-old son and 11-year-old daughter needed new clothes, but were now unable to get them.  His wife owed money to a friend in North Carolina who had helped her with some basic bills, including clothes for her children.  She had promised to repay that friend in April of 2019 when she and her children visited the friend.  But without the tax refund, the visit was canceled causing embarrassment to her, and disappointment to her and her children.

277.    Mr. Sidibe seeks the return of his tax refund, but not any damages, from the federal Defendants.

### Plaintiff Jacqueline Chretien

278.    Jacqueline Chretien ("Ms. Chretien") is 37-years-old.  She is the mother of three minor children, lives in a domestic violence shelter in the Bronx, and currently is unemployed.

279.    Between 2005 and 2007, Ms. Chretien received six direct loans totaling $15,800 to attend college within the CUNY system.  In 2007, Ms. Chretien became pregnant and was unable to complete her degree.

280.    From 2008 to 2015, Ms. Chretien worked various low-paying jobs as a waitress, home attendant, and restaurant hostess while raising her only child at the time.

281.    To make ends meet, Ms. Chretien received food stamps, lived with her mother, relied occasionally on credit cards, and deferred repayment of her loans, as allowed.

282.    In 2014, Ms. Chretien's low income prevented her from repaying her loans and she defaulted.

283.    On August 1, 2014, DOE sent Ms. Chretien its due process notices that failed to advise her that she could avoid offset by consolidating her loans without making any up-front payment, after which her payments would be $0.00 a month if she lived below 150% of the poverty line (which was the case).

284.    By February of 2016, Ms. Chretien was facing a financial calamity.  Her bank account had been frozen by judgment creditors and her wages were being garnished.  She consequently needed to file for bankruptcy and, as part of her *pro se bankruptcy* petition, she needed to finalize her 2015 taxes.

285.    By February of 2016 more than 18 months had passed since Ms. Chretien received DOE's due process notices and she had forgotten that the tax refund offset was a consequence of her default.

286.    In late March or early April, 2016, Ms. Chretien filed her 2015 tax return for which she was due a $5,200 refund, most of which consisted of Earned Income and Child Tax Credits.

287.    Upon information and belief, Treasury knew or should have known that over a year had passed since DOE sent Ms. Chretien its due process notices and hence that Ms. Chretien was unaware that her property interest in a tax refund was in jeopardy.

288.    Upon information and belief, Treasury could easily have issued a pre-offset notice advising Ms. Chretien that her tax refund would be delayed so that she could address her student loan default, including by filing a Consolidation application.

289.    Instead, on April 4, 2016, and without any notice, Treasury intercepted the $5,200 refund and sent its post-offset notice.

290.    Had she known that she could protect her tax refund without making any payment by consolidating her loans out of default, Ms. Chretien would have done so earlier and thereby averted the offset of her tax refund.

291.    Ms. Chretien has since entered the Consolidation program, and has remained current on her loans through an Income-Driven Repayment Plan.

292.    Because of the federal Defendants' actions and omissions, Ms. Chretien was not able to take advantage of the Consolidation program until 2016.

293.    The actions and omissions of the federal Defendants injured Mr. Chretien by causing the offset of the $5,200 tax refund in 2016.  With an annual income below $14,000 Ms. Chretien and her daughter needed the refund for clothes, toys, and other necessities.

294.    Ms. Chretien seeks the return of her tax refund, but not any damages, from the federal Defendants.

**Plaintiff Catherine Assanah**

295.    Catherine Assanah is a 49-year-old U.S. citizen from Guyana.

296.    She lives with her two children in Brooklyn and is currently unemployed, having suffered a stroke in June 2021.

297.    From 2005 to 2017, Ms. Assanah worked as a Nursing Assistant which paid poorly.

298.    In 2010, she was enticed by TV ads to call Sanford-Brown, a for-profit college that promised a better financial future for its graduates.

299.    The recruiter said Sanford-Brown was free because Ms. Assanah's income was low.

300.    Unbeknownst to Ms. Assanah, the school was not free.  Rather, the financial aid worker took out $12,049 in loans on her behalf from 2010 to 2012.  (Sanford-Brown also received $13,012 in Pell grants on behalf of Ms. Assanah.)

301.    The education proved worthless and did not help Ms. Assanah find more fulfilling or higher-paying employment.

302.    Around this time, in 2012 and 2013, the school was cited in a U.S. Senate report on for-profit-education fraud and also entered into a $10 million settlement with the State of

New York for its fraudulent actions against its students.

303.     Not knowing she had taken out loans, Ms. Assanah defaulted in early 2017.

304.     On information and belief, DOE sent its due process notices on May 30, 2017 to Ms. Assanah that warned her that her tax refund could be offset.

305.     These notices did not appraise Ms. Assanah that she could easily avoid offset of her tax refund by Consolidating her loans.

306.     Ms. Assanah would have consolidated her loans out of default if she had been so advised in DOE's due process notice.

307.     On or about May 18, 2018, Ms. Assanah filed her 2017 tax return.  Her earnings were well below the poverty line for a family of three.  Consequently she was entitled to a $6,816 refund that consisted almost completely of an Earned Income and Child tax credits that would have brought her family slightly above the poverty line.

308.     On or about May 29, 2018, Treasury offset her entire refund of $6,816 and sent its post-offset notice that did not advise her that Consolidation was a quick and affordable means of getting out of default.

309.     In June 2018, Ms. Assanah, contacted a non-defendant, collector who did not tell her she could get out of default through Consolidation without making any payments.  Without understanding this important option, Ms. Assanah remained in default.

310.     On November 9, 2021, Ms. Assanah called DMCS/Maximus to ask about Consolidation.  Maximus' agent stated, incorrectly, that Ms. Assanah first had to make three, payments before Consolidating.  Maximus' agent stated, incorrectly, that Ms. Assanah could not Consolidate without these payments, even though she was not working and short on funds.

311.     Nevertheless, on November 29, 2021, Ms. Assanah filed a Consolidation application on-line without making any up-front payment which was approved in late December 2021.

312.     Because of  the actions and omissions of the federal Defendants and Defendant Maximus, Ms. Assanah was not able to take advantage of the Consolidation program until 2021.

313.     Because of  the actions and omissions of the federal Defendants, Ms. Assanah was injured.  At the time of her tax refund offset, Ms. Assanah was behind in her rent.  She also needed to replace her children's thread-bare and poor-fitting clothes, which caused them embarrassment and her shame.  Her son, whose sneakers were riddled with holes, was particularly upset that she was not able to replace them.

314.     Ms. Assanah was also harmed by the actions and omissions of Maximus in 2021. She worried that her November 2021 Consolidation application would not get her out of default given Maximus' contrary statement regarding the Consolidation requirements. She worried that if Maximus was right and she was wrong, she might remain in default and have her 2021 tax refund offset in 2022.

315.     Ms. Assanah seeks the return of her tax refund, but not any damages, from the federal Defendants, and seeks damages, including emotional distress damages, from Maximus.

**Plaintiff Melissa Escudero**

316.     Melissa Escudero is 29 years old and the child of immigrants.

317.     From 2011 to 2015, Ms. Escudero attended City College of New York, received Pell grants because her family income was low, and took-out federal loans totaling $19,394.

318.    After graduating in 2015, she worked in various low paying jobs, was unable to pay her loans, and defaulted.

319.    On August 1, 2018, DOE sent its due process notices that did not apprise Ms. Escudero that she could easily avoid offset of her tax refund by Consolidating her loans.

320.    In early 2019, Ms. Escudero filed her 2018 taxes on which she was entitled to a $752 refund.

321.    On or about April 17, 2019, Treasury intercepted Ms. Escudero's $752 refund and sent its post-offset notice that omitted Consolidation as a quick and cheap method of getting out of default, but instead directed Ms. Escudero to contact DMCS/Maximus.

322.    Thereafter, Ms. Escudero contacted DMCS/Maximus and was referred to a non-defendant-collector who gave her only one option to get out of default—entering a Rehabilitation program.

323.    Not knowing that she could get out of default within one to two months without paying any money, Ms. Escudero thereafter entered into a repayment plan whereby she remained in default while paying $5 a month for nine months during which time the non-defendant collector earned servicing and collection fees.

324.    On information and belief, the non-defendant-collector received a Rehabilitation commission of between $1,300 and $1,710 after Ms. Escudero's loans were rehabilitated out of default in the spring on 2020.

325.    Had DOE and its collector, and Treasury in its post-offset notice advised Ms. Escudero of her right to consolidate her loan out of default to avoid tax refund intercept, she would have done so.

326.     Because of the federal Defendants' actions and omissions, Mr. Escudero was not able to take advantage of the Consolidation program.

327.     The federal Defendants' actions and omissions injured Ms. Escudero, who needed the $752 refund as she was struggling to pay her rent.

328.     Ms. Escudero seeks the return of her tax refund, but not any damages, from the federal Defendants.

## CLAIMS FOR RELIEF
## FIRST CAUSE OF ACTION

### VIOLATION OF DUE PROCESS
**(All Plaintiffs Against the Department of Education)**

329.     Plaintiffs reassert and reallege the above paragraphs as if fully set forth.

330.     Section 706(2)(b) of the Administrative Procedure Act authorizes a federal court to review the constitutionality of DOE's notices and procedures.

331.     Plaintiffs have a property interest in unfettered access to the full amount of their tax refunds and, in the case of Reed and Grace, Social Security benefits.

332.     Plaintiffs likewise have a statutory right pursuant to 20 U.S.C.A. § 1087e(g) and §1078-3(a)(3)(A)(ii)(III) to bring their defaulted loans out of default status through Consolidation.

### DOE's Inadequate Notices Violated Due Process

333.     DOE deprived Plaintiffs of due process by not advising them in DOE's putative due process notices that Plaintiffs could avoid offset by bringing their loans current without any up-front payment through Consolidation.  34 C.F.R. § 685.220(d)(1)(i)(A)(3).

44

334.    Further, DOE deprived Plaintiffs of due process by mischaracterizing the Consolidation criteria, stating in the putative due process notices that Plaintiffs needed to pay their "debt by a mutually agreeable installment plan . . ." (Exhs. A and B) when in fact no negotiation and no payment are required in order to obtain Consolidation.

335.    Further, DOE deprived Plaintiffs of due process by misstating that no action could stop the offset for borrowers who "cannot afford to pay this debt" other than "to arrange payment terms" with DMCS/Maximus (Exh. D) when Consolidation provided exactly such relief without any payment.

### DOE Violated Plaintiffs' Due Process by Relying on Stale Notices

336.    Plaintiffs are entitled to notice reasonably calculated to inform them that a concrete property interest, and not a mere hypothetical one, is subject to a taking through offset.

337.    DOE sent Mr. Perry its putative due process notices some time prior to 2008, more than five years before his tax refunds were offset in 2013, 2014, 2015, 2016,  2017 and 2018.

338.    DOE sent Ms. Chretien its putative due process notices on August 1, 2014, some 18 months before her tax refund was offset on April 4, 2016.

339.    DOE sent Mr. Reed its due process notices in December 2015, some 14 months before it offset his tax refund in February 2017.

340.    The warning in these notices did not constitute due process because they was given many months if not years before these Plaintiffs were eligible for a tax refund and therefore failed to provide meaningful notice.

341.    The long passage of time between notice and eligibility for a refund prevented the notices from provide actual notice of the potential offset.

### DOE Violated Plaintiffs' Due Process by Failing to Send Notices to Plaintiffs' Current Addresses

342.    DOE is required to provide constitutionally adequate notice in a manner reasonably likely to be received by the borrower.

343.    DOE is authorized to use the addresses borrowers have provided on their tax returns to apprise them of their pending action.

344.    Yet, DOE has chosen only to provide notice at the last known address it has in its records, even though such a policy is not reasonably calculated to provide actual notice.

345.    Because of this policy, DOE failed to provide actual notice to Plaintiffs Unruh, Perry, and Reed, in violation of their due process rights.

346.    Due to these due process violations, Plaintiffs have suffered tax refund offsets and Social Security offsets without knowing their property is in jeopardy and that statutory remedies exist to protect it.

347.    Because of these due process violations, Plaintiffs Ms. Perez, Ms. Unruh, Mr. Reed, Mr. Sidibe, Mr. Perry, Ms. Chretien, Mr. Assanah, and Ms. Escudero seek the return of their offset tax refunds.

348.    Plaintiffs Reed and Grace also seek the return of their Social Security retirement payments that were also offset by Defendant DOE's unconstitutional conduct.

349.    All the Plaintiffs seek an injunction pursuant to 5 U.S.C. § 706 barring DOE from using notices with unconstitutional content and unconstitutional procedures regarding when and where the notice is sent.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT
### (All Plaintiffs Against the Department of Education)

350.　Plaintiffs reassert and reallege the above paragraphs as if fully set forth.

### DOE Deprived Plaintiffs of Property through Arbitrary and Capricious Actions

351.　Section 706 of the Administrative Procedure Act authorize a federal court  to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

352.　Borrowers have a statutory and regulatory right to either Rehabilitate or Consolidate their loans pursuant to 20 U.S.C. § 1078-6, and 34 C.F.R. § 682.405 (Rehabilitation), and 20 U.S.C.A. §§ 1087e(g) and 1078-3(a)(3)(A)(ii)(III) and 34 C.F.R. § 685.220 (Consolidation).

353.　Nevertheless, DOE consistently provides borrowers with only one option— Rehabilitation—and encourages that option through its practice of paying large commissions to debt collectors that incentivize them to steer borrowers to Rehabilitation and not to disclose the availability of Consolidation, even though Consolidation is a more favorable option for many borrowers.

354.　Rewarding debt collectors for steering borrowers to Rehabilitation increases the cost of student lending and is contrary to the letter and the intent of the law.

355.　DOE's practice of steering borrowers to Rehabilitation and not divulging the availability of Consolidation is arbitrary, capricious, an abuse of discretion, or otherwise not in Accordance with law.  5 U.S.C. § 706(2)(a).

**DOE Deprived Plaintiff Sidibe of Property in Violation of the APA**

356.    The Administrative Procedures Act directs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action . . . not in accordance with law."  5 U.S.C. § 706.

357.    Under 34 C.F.R. § 685.211, DOE must bring a loan out of default after the borrower has made nine, reasonable and affordable payments on a timely basis over a ten-month period.

358.    Mr. Sidibe made nine such reasonable and affordable payments beginning on July 23, 2018 and ending on March 23, 2019.

359.    Nevertheless, Mr. Sidibe's tax refund remained certified for offset and was taken on or about April 1, 2019.

360.    Not until May 6, 2019 did DOE bring Mr. Sidibe's loan out of default and, upon information and belief, decertify his debt for Treasury offset.

361.    Further, DOE and its agents failed to take reasonable steps to rectify the situation when Mr. Sidibe contacted them shortly after his tax refund was taken on April 1, 2019.

362.    Due to these violations of the Administrative Procedures Act, Plaintiffs have suffered tax refund intercepts and Social Security offsets in the case of Reed and Grace.

363.    Because DOE's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the court must set aside the offsets and return the tax refunds and/or Social Security payments to the Plaintiffs.

### THIRD CAUSE OF ACTION

### VIOLATION OF DUE PROCESS
**(Plaintiffs Unruh, Chretien, Perry, Reed, and Grace Against the Treasury Department)**

364.    Plaintiffs reassert and reallege the above paragraphs as if fully set forth.

365.    Section 706(2)(b) of the Administrative Procedure Act authorizes a federal court to review the constitutionality of Treasury's notices and procedures.

366.    The constitution requires adequate notice in a manner reasonably likely to be received by Plaintiffs before Treasury offsets their tax refunds.

### Treasury Violates Due Process by Failing to Adequately Ensure
### Borrowers Subject to Offset Have Received Notice

367.    DOE mails its due process notices to the last known address DOE has of the borrower, 34 C.F.R. § 30.22(a)(i)(2), and then provides that address to Treasury when certifying the account for offset.  31 C.F.R. § 285.5(d)(5)(ii).

368.    A defaulted borrowers with a debt certified for offset tells Treasury where she actually lives when she files a tax return that is subject to tax refund offset.

369.    Treasury knows when the defaulted borrower no longer lives at an address where DOE's pre-offset notice was sent, but does not send a pre-offset notice nor defer offsetting a refund until the borrower may be notified.

370.    Treasury knew or should have known that DOE had sent its due process notices to an address where Ms. Unruh, Mr. Perry, and Mr. Reed no longer lived.

371.    Yet Treasury took no action to ensure Ms. Unruh, Mr. Perry, and Mr. Reed were aware of the pending offset even though they knew exactly where the defaulted borrowers lived.

**Treasury Violated Plaintiffs' Due Process by Relying on Stale Notices**

372.    Plaintiffs are entitled to notice reasonably calculated to inform them that a concrete property interest, and not a mere hypothetical one, is subject to a taking through offset.

373.    Treasury is aware when more than a year has passed since the due process notices were issued because DOE must issue an annual certification after the first certification.  31 C.F.R. § 285.5(d)(7).

374.    DOE sent Mr. Perry its putative due process notices some time prior to 2008, more than five years before his tax refunds were offset in 2013, 2014 2015, 2016, 2017, and 2018.

375.    DOE sent Ms. Chretien its putative due process notices on August 1, 2014, some 18 months before her tax refund was offset on April 4, 2016.

376.    DOE sent Mr. Reed its due process notices in December 2015, some 14 months before it offset his tax refund in February 2017.

377.    The warning in these notices did not constitute due process because they were given many months if not years before these Plaintiffs were eligible for a tax refund and therefore failed to provide meaningful notice.

**Treasury's Inadequate Pre-Offset Notice titled**
***Funds May Be Withheld from Your Social Security Benefit Payment***
**Violates Due Process**

378.    Defendant Treasury sends a Pre-Offset Notice titled *Funds May Be Withheld from Your Social Security Benefit Payment* that directs borrowers to call DOE's default collectors to determine rights and remedies. These collectors are incentivized to prioritize Rehabilitation.

379.    Treasury's pre-offset notice to Social Security recipients omits that defaulted

loans can be quickly brought current to avoid offset without any payment through Consolidation.

380.   Due to these violations of their due process, Plaintiffs Reed and Grace have suffered the loss of their Social Security benefits.

## **Treasury's Inadequate Post-Offset Notices Violated Due Process**

381.   DOE deprived the Plaintiffs of due process by not advising them in DOE's putative due process notices that Plaintiffs could avoid future offsets by bringing their loans current without any up-front payment through Consolidation.  34 C.F.R. § 685.220(d)(1)(i)(A)(3).

382.   Treasury's post-offset notices direct borrowers to call DOE's default collectors to determine rights and remedies. These collectors are incentivized to prioritize Rehabilitation.

383.   Due to these violations of their due process, Plaintiffs have suffered the loss of their tax refunds.

384.   Plaintiffs Unruh, Reed, Grace and Perry received a Treasury post-offset notice that omitted Consolidation as a quick remedy out of default without any up-front payment.  Perry did not respond to the notice because it failed to provide a solution to his problem. The other three followed Treasury's directive in its post-offset notice and called DOE's collector, were steered to Rehabilitation, and consequently were deprived of their next tax refund (Unruh, Reed), and Social Security payments (Reed and Grace).

385.   Because Treasury's pre-and post-offset notice and mailing practices were constitutionally inadequate, the court must set aside the offsets and return the tax refunds and/or Social Security payments to the Plaintiffs Unruh, Reed, Perry and Grace.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
**(Plaintiff Unruh Against Coast)**

386.    Plaintiff Unruh reasserts and realleges the above paragraphs as if fully set forth.

387.    The Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.,

prohibits debt collectors from engaging in abusive, deceptive, or unfair practices.

388.    Defendant Coast is a debt collector as that term is defined in 15 U.S.C. §

1692a(6), because:

    a)  It is a person who regularly uses instrumentalities of interstate commerce and the mails in a business the principal purpose of which is the collection of debts, and regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another; and

    b)  It acquired Ms. Unruh's student loan account when the account was already in default.

389.    Defendant Coast violated the following provisions of the FDCPA:

    a)  15 U.S.C. § 1692e by using false and deceptive representations in connection with the collection of a debt owed by Ms. Unruh; and

    b)  15 U.S.C. § 1692f by using unfair or unconscionable means to collect a debt.

390.    Specifically, Defendant Coast:

    a)  misrepresented that Ms. Unruh's only option to bring her loans out of default was full repayment or Rehabilitation;

    b)  withheld information regarding Ms. Unruh's option to Consolidate her debt and thereby avoid offset.

391.    Ms. Unruh suffered emotional distress damages by Coast's actions in that:

    a)  she worried whether Consolidation was the correct path out of default after Coast, a collector retained by DOE and presumably well informed of rules regarding defaulted loans, twice stated that Rehabilitation was the only path if she could not immediate pay most of the defaulted debt;

    b)  She further worried that if Coast was right and Consolidation was the wrong path, she would remain in default for at least another 10 months during which she would not be able to return to school and could be subject to collection action including tax refund offset.

392.    As a result of Coasts actions, Ms. Unruh is entitled to recover:

    a)  statutory damages of up to $1000;

    b)  actual damages including emotional distress damages;

    c)  reasonable attorney's fees, and costs.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE DECEPTIVE PRACTICES ACT
### (Plaintiff Unruh Against Coast)

393.    Plaintiff Unruh reasserts and realleges the above paragraphs as if fully set forth.

394.    Coast "conducted a business" and/or "furnished a service" as those terms are defined in New York's Deceptive Practices Act, General Business Law § 349 ("GBL 349").

395.    Coast's conduct was "consumer-oriented."  Coast provides services to student loans borrowers throughout New York. Coast's loan servicing practices have a broad impact on consumers with little knowledge of the practices or procedures of the student loan industry.

396.    Upon information and belief, Coast has engaged in the same pattern of behavior with respect to other student loan borrowers in default who contacted it for assistance and therefor its conduct has a broad impact on other student loan borrowers who are in default.

397.    Coast has violated GBL 349 by engaging in acts that were misleading in a material way, deceptive, and contrary to public policy and generally recognized standards of business.

398.    Specifically, Defendant Coast deceived Ms. Unruh by:

a) misrepresenting that Rehabilitation was the only path to bringing her loans current and out of default to avoid offset and other collection activities;

b) Omitting that the Consolidation was an option and that it would resolve her default far more quickly without requiring any up-front payment.

399.    Defendant Coast's affirmative misrepresentations and omissions were willful or knowing, as defined under GBL § 349(h).

400.    Ms. Unruh was injured by Defendant Coast's deceptive, oral statements when:

a) her $512 tax refund was intercepted in 2019 and she made $180 worth of unnecessary, monthly Rehabilitation payments;

b) she was unable to secure student loans to pay for her tuition at a mortuary school because she remained in default on her loans;

c) she was billed for over $18,000 by the mortuary school and advised she could neither get her transcript nor reenroll at the institution without first repaying the debt;

d) she was caused to and continues to worry whether she will be able to finish her mortuary school education, which she is half way through and which remains a profession she wants to enter.

401.    Because of the above injuries, Ms. Unruh entitled to:

a) Actual damages, including $180 in Rehabilitation payments, the improperly-offset tax refund ($512), the outstanding tuition at the mortuary school that she incurred,  as well as emotional distress injuries related to, but not limited to, her inability to complete her mortuary school education without first paying the debt she owes it, as well as punitive damages up to $1,000. NY GBL § 349(h);

b) an injunction barring Coast from using similar deceptive practices with other defaulted borrowers and directing Coast to provide defaulted borrowers with complete and accurate information about Consolidation options

c) Attorney's fees and other costs pursuant to GBL § 349.

## SIXTH CAUSE OF ACTION

### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
**(Plaintiffs Reed, Grace and Assanah Against Maximus)**

402.    Plaintiffs reassert and reallege the above paragraphs as if fully set forth.

403.    The Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.,

prohibits debt collectors from engaging in abusive, deceptive, or unfair practices.

404.    Defendant Maximus is a debt collector as that term is defined in 15 U.S.C. §

1692a(6), because:

    a)  It is a person who regularly uses instrumentalities of interstate commerce and the mails in a business the principal purpose of which is the collection of debts, and regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another; and

    b)  It acquired Mr. Reed's Ms. Grace's and Ms. Assanah's student loan accounts when the accounts were already in default.

405.    Defendant Maximus violated the following provisions of the FDCPA:

    a)  15 U.S.C. § 1692e by using false and deceptive representations in connection with the collection of a debt owed by Reed, Assanah and Grace; and

    b)  15 U.S.C. § 1692f by using unfair or unconscionable means to collect a debt.

406.    Maximus violated the FDCPA by:

    a)  misrepresenting that Reed, Grace and Assanah could Consolidate their loans out of default, but only after completing a financial disclosure form used to determine a "reasonable and affordable payment," and then by making three, on time, consecutive payments when, in fact, Consolidation did not require such payments;

    b)  Misrepresenting that Mr. Reed, Ms. Grace and Ms. Assanah could not consolidate their loans out of default without making any payments.

    c)  Making such misrepresentations when it knew or should have known that up-front payments were not required if a defaulted borrower agreed to enroll in IDR when consolidating.

55

407.  Maximus' misrepresentations injured Mr. Reed, Ms. Grace and Ms. Assanah by causing them:

  a) to worry that they were on the wrong path after they Consolidated their loans on-line without first making three reasonable and affordable payments that Maximus would determine by considering their expenses and income;

  b) to worry that their Consolidation applications would be rejected and their Social Security payments and tax refunds offset because they had not followed Maximus' misrepresentations to make three monthly payments before consolidating.

408.  As a result of Maximus' actions, Mr. Reed, Ms. Grace and Ms. Assanah are entitled to recover:

  a) statutory damages of up to $1000;

  b) actual damages including emotional distress damages;

  c) reasonable attorney's fees, and costs.

## SEVENTH CAUSE OF ACTION

### VIOLATION OF THE DECEPTIVE PRACTICES ACT
### (Plaintiffs Reed, Grace, and Assanah Against Maximus)

409.  Plaintiffs reassert and reallege the above paragraphs as if fully set forth.

410.  Maximus "conducted a business" and/or "furnished a service" as those terms are defined in New York's Deceptive Practices Act, General Business Law § 349 ("GBL 349").

411.  Maximus' conduct was "consumer-oriented."  Maximus provides services to student loans for borrowers throughout New York. Maximus' loan servicing practices have a broad impact on consumers with little knowledge of the practices or procedures of the student loan industry.

56

412.    Upon information and belief, Maximus has engaged in the same pattern of behavior with respect to other student loan borrowers in default who contacted it for assistance and therefor its conduct has a broad impact on other student loan borrowers who are in default.

413.    Maximus' engaged in deceptive acts and practices with Mr. Reed, Ms. Grace and Ms. Assanah by:

a)  misrepresenting that they had to make three monthly payments before consolidating their loans out of default;

b)  Misrepresenting it was impossible for the defaulted borrowers to consolidate their loans without making the three, up-front payments;

c)  Omitting that the defaulted borrowers could consolidate their loans out of default without any up-front payments;

d)  Misrepresenting to Mr. Reed in 2017 that "reasonable and affordable" payments would bring his loans out of default and protect him from future offsets, when he had already rehabilitated his loans out of default and his loans could not be brought out of default by making such payments.

414.    Maximus' misrepresentations were willful or knowing, as defined under GBL § 349(h).

415.    As a result of these deceptive acts Mr. Reed sustained the following injuries:

a)  Mr. Reed needlessly had $50 of his Social Security offset while making $22 monthly payments from June 2017 until March 2020 over 33 months for a total of  $2,376;

b)  Mr. Reed was also harmed with an additional tax refund intercept in the amount of $354 on February 9, 2018;

c)   Mr. Reed suffered emotional distress damages in the form of hunger, depression, worry, embarrassment and shame caused by his loss of Social Security income.  Mr. Reed had to ask for money from strangers and acquaintances, had to ask for aid from his former-wife, and had to resort to public begging on the internet through  a Go-Fund-Me campaign, much of which was caused by the loss of income proximately caused by  Maximus' offsets.

416.    Because of the above injuries, Mr. Reed is entitled to:

    a)  Actual damages, including the Social Security and tax refund offsets and Rehabilitation payments that occurred from June 2017 onward;

    b)  emotional distress damages;

    c)  punitive damages of up to $1,000. NY GBL § 349(h);

    d)  an injunction barring Maximus from using similar deceptive practices in the future and directing Maximus to provide defaulted borrowers with complete and accurate information about Consolidation options;

    e)  attorney's fees and other costs pursuant to GBL § 349.


**EIGHTH CAUSE OF ACTION**

**VIOLATION OF GBL § 349-c's PROHIBITION ON DECEIVING ELDERLY CONSUMERS**
**(Plaintiffs Reed and Grace Against Maximus)**

417.    Plaintiffs reassert and reallege the above paragraphs as if fully set forth.

418.    A defendant whose deceptive conduct is perpetrated against an elderly person may be liable for an additional civil penalty not to exceed $10,000.

419.    Maximus violated GBL § 349-c by using deceptive acts and practices directed against persons known to be elderly and by willfully disregarding the rights of the elderly, thereby causing Mr. Reed to suffer emotional distress and economic damages and Ms. Grace to suffer emotional distress damages.

420.    As a result of these violations of GBL § 349-c are each entitled to recover a civil penalty not to exceed $10,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)      Enter a declaratory judgment that DOE and its agents violate the due process clause of the Fifth Amendment to the United States Constitution by not providing meaningful notice to Plaintiffs of their rights to avoid tax refund offsets by consolidating their loans out of default;

b)      Enter a declaratory judgment that DOE's and Treasury's practice of only sending one due process notice of the consequence of offset even when more than a year has passed from the time of the initial notice and the subsequent date of the offset violates the due process clause of the Fifth Amendment to the United States Constitution;

c)      Enter a declaratory judgment that DOE's and Treasury's failure to send the pre-offset notice to the most recent address provided to the IRS by Plaintiffs Unruh, Perry and Reed on their tax returns for which a refund is owed violates the due process clause of the Fifth Amendment to the United States Constitution;

d)      Enter a declaratory judgment against Treasury that its pre-offset notice to Social Security recipients, including Plaintiffs Reed and Grace, violates the due process clause due to its failure to apprise borrowers of the availability of Consolidation as a means to stop the offset;

e)      Enter a declaratory judgment that it was arbitrary and capricious for DOE to: compensate its collectors so as to promote Rehabilitation over Consolidation so as to injure Plaintiffs;  and not decertify Plaintiff Sidibe's debt for offset after Mr. Sidibe made his ninth timely Rehabilitation payment;

f)      Order  DOE and Treasury to return the Plaintiffs' tax refunds and Social Security payments that were offset;

g)      Order DOE and Treasury to rewrite their pre-offset notices and, as to Treasury, post-offset notices to comply with due process;

h)      Order DOE and Treasury to develop procedures that ensure DOE's pre-offset notice is received by the borrower within a reasonable time before the offset occurs;

i)      Order DOE to remedy practices that incentivize collectors to steer borrowers towards Rehabilitation rather than Consolidation;

j)      Find that Defendant Coast violated the FDCPA with respect to Plaintiff Unruh and order the award of statutory damages, and actual damages;

k)      Find that Defendant Coast violated the GBL 349 with respect to Plaintiff Unruh and order the award of statutory damages, and actual damages;

l)      Order, pursuant to GBL 349(h), the award of additional damages, up to $1,000, from Coast to Plaintiff Unruh because Coast's deceptive acts were "willful or knowing";

m)      Find that Maximus violated the FDCPA with respect to Plaintiffs Reed, Assanah and Grace and award statutory damages, and actual damages;

n)      Find that Maximus violated GBL 349(h) with respect to Plaintiffs Reed, Assanah and Grace and order the award of actual damages, which include emotional distress damages,.

o)      Order, pursuant to GBL 349(h), the award of additional damages, up to $1,000 each, from Maximus to Plaintiffs Reed, Assanah and Grace because Maximus' deceptive acts were "willful or knowing";

p)      Order, pursuant to GBL 349-c, the award of additional damages, up to $10,000

each, from Maximus to Plaintiffs Reed and Grace because Maximus willfully and knowingly

engaged in deceptive acts against persons known to be elderly and on fixed incomes;

q)      Enjoin Coast and Maximus from engaging in future deceptive conduct pursuant to

GBL 349;

r)      Award costs and reasonable attorney's fees from DOE and Treasury pursuant to

the Equal Access to Justice Act,  and from Coast and Maximus pursuant to the FDCPA and NY

GBL 349(h);

s)      Award such other and further relief as this Court deems just and proper;


Dated: January 6, 2022
Brooklyn, New York

                    By:      _____/s/_____

                             JOHNSON M. TYLER
                             TRALANE HAYNES
                             SHABNAM FARUKI
                             Brooklyn Legal Services
                             105 Court Street
                             Brooklyn, NY 11201
                             Attorneys for Plaintiffs
                             (718) 237-5500